## THE JOHN H. STARIN.

### (Circuit Court of Appeals, Second Circuit. April 9, 1903.)

### No. 120.

**1. Collision—Anchored Vessel—Duty in Dangerous Locality.**

A schooner anchoring in the night in the center of a channel 800 feet wide in a harbor, and in the usual track of outgoing and incoming steamers, when there were safe anchorage grounds on either side, is bound to take all precautions necessary to make her presence known to passing vessels.

**2. Same—Maintaining Light—Evidence.**

Evidence that a light was hung in the rigging of an anchored schooner at dark, and that it was burning 20 or 30 minutes before she was struck and sunk by a passing steamer at about 11 o'clock, is not sufficient to establish that it was burning at the time of the collision, against the positive testimony of the lookout and two officers of the steamer, who were at the wheel and in good position to see, all of whom testified that there was no light on the schooner, and she was not seen until they were within 200 feet.

**3. Same—Contributory Fault—Excessive Speed.**

The facts that a steamer coming out of New Haven Harbor in the night, when she came into collision with a schooner anchored in the channel, 1½ or 2 miles from the dock, was going at a speed of 12 knots, and was near the center of the channel, which was 800 feet wide, are not faults contributing to or causing the collision, where her course was that usually taken by all New York steamers, and where the proximate cause of the collision was the failure of the anchored schooner to carry any light.

Appeal from the District Court of the United States for the District of Connecticut.

Decree adjudging the steamer John H. Starin solely at fault and liable for the damages occasioned by a collision between the steamer and the schooner Allen Gurney, which caused the latter to sink. The claimant of the Starin appeals.

For opinion below, see 113 Fed. 419.

Henry G. Newton, for appellant.
Samuel Park, for appellees.

Before WALLACE, LACOMBE, and COXE, Circuit Judges.

COXE, Circuit Judge. The collision occurred in New Haven Harbor on the night of October 18, 1900, at about a quarter before 11 o'clock. The Starin is a side-wheel passenger steamer, 200 feet long and 55 feet beam. At the time in controversy she was drawing about eight feet of water. The Gurney is a two-masted schooner, 95 feet long. She was loaded with 300 tons of paving stones and had a crew consisting of three men, a master, a mate and a cook. She was drawing 9½ feet of water and was anchored in the center of the channel, having out 15 fathoms of chain. She was headed about northwest. It was a clear night, but cloudy overhead; the tide was ebb, running about two miles an hour. The wind was light, west to southwest. The schooner had both mainsails up, reefed, and early in the evening an anchor light had been set in the forward starboard rigging. Between New Haven and the Gurney, and about a quarter of a mile north of the Gurney, a dredge was anchored near the middle of the channel and between them, but farther to the westward, was the schooner Alleck. Both the dredge and the Alleck had anchor lights up and burning. No other vessels were in the channel except the tug Gaynor, which, at the time of the collision, was lying near the dredge. The distance from the Long Wharf to the place where the Gurney lay is variously estimated from a mile and a half to two miles. An examination of the chart would indicate that it was about a mile and three-quarters. The dredged channel is straight and at the point in controversy is about 800 feet wide. The Starin left her dock at 22 minutes past 10, her captain and quartermaster, both licensed pilots, were at the wheel and there was a lookout on the fore deck. The windows of the pilot house were open. After straightening on her course she was hooked up and was making about 12 knots an hour over the ground at the time she first sighted the Gurney, 200 feet dead ahead. The Starin reversed and starboarded, but it was then too late. The stem of the Starin struck the Gurney full in the fore rigging tearing it down and cutting through to the foremast. No one was on the schooner's deck at the time. All three of the witnesses for the Starin testify positively that they saw no light on the schooner.

The District Judge found that there was a proper anchor light burning some 20 or 30 minutes prior to the collision, but that there was no satisfactory evidence that it continued burning up to the time of the collision. Upon the whole case he concluded, however, that the light was burning. After having read with care the entire record we are unable to concur in this conclusion. The question whether or not a light was burning is the crucial question in the case. All concede that if the light was out it was negligence on the part of the Gurney.

We do not deem it necessary to hold that it was a fault, per se, for a schooner to anchor at night in the center of a channel but 800 feet

wide and directly in the path of incoming and outgoing steamers. In New Haven Harbor there is good anchorage ground on both sides of the dredged channel and there was absolutely no necessity for the Gurney to anchor in the center of the channel where fast steamers were frequently passing in and out. In such circumstances we are clearly of the opinion that, having chosen so dangerous a position, it was incumbent upon her to take unusual precautions to make her presence known to the steamers which she knew must pass in close proximity. It was her duty to see not only that her light was burning when placed in the rigging but that it was kept burning during the hours of darkness. If, in order to accomplish this result with certainty, it was necessary to keep a watchman on deck, such a watchman should have been provided.

The act of March 3, 1899, c. 425, 30 Stat. 1152, § 15 [U. S. Comp. St. 1901, p. 3543], provides, "That it shall be unlawful to tie up or anchor vessels or other craft in navigable channels in such a manner as to prevent or obstruct the passage of other vessels or craft." The courts have frequently held that the precautions taken by a vessel voluntarily anchoring in a dangerous position should be commensurate with the perils assumed. The Clara, 102 U. S. 200, 26 L. Ed. 145; The Sapphire, 11 Wall. 170, 20 L. Ed. 127; The Worthington (D. C.) 19 Fed. 836; Ross v. Trans. Co., 43 C. C. A. 538, 104 Fed. 302; The Ogemaw (D. C.) 32 Fed. 919, 926.

As before stated, only three persons saw the Gurney just prior to the collision; these were the captain, the quartermaster and the lookout of the Starin. They were all experienced seamen; two were at the wheel and one at the bow; there was nothing to intercept their vision. They were just commencing their voyage and we have a right to assume that in passing out of the harbor in such circumstances each was alert in the discharge of his duty. The presumption is well-nigh conclusive that at least one of the three would have seen the light had it been burning. The property of their employers and the lives of their passengers were in their keeping and it is impossible to suppose that they would have deliberately run down an anchored vessel if they had known of her presence. The Monmouthshire (D. C.) 44 Fed. 697; The General (D. C.) 82 Fed. 830. What is there to rebut this positive testimony and almost equally positive presumption? Nothing but the testimony that a light was set some time after sundown and that it was seen 20 minutes or half an hour before the collision. The attempt to show that it was burning after the collision was an utter failure.

The fore-rigging was torn away by the force of the blow and the light went down with the wreckage. Even the master of the Gurney testifies to this.

"Question. Do you know whether the Gurney's light could be seen after the Starin struck her? Answer. It was not, for it went down. It took the rigging right down. * * * Question. So you are sure that your light was put out by the Starin? Answer. The light hung in our starboard fore-rigging, and that was torn down."

The testimony as to the condition of the lantern when hung up is indefinite and unsatisfactory. The mate of the Gurney testifies that

he hung the lantern in the rigging; he does not say when he did this or how much oil there was in the reservoir. It was the duty of the cook to clean and fill the lantern, but the regular cook had left some three days before and the man who took his place and who filled the lantern, if it was filled, was not called as a witness. The mate in answer to the question, "Where did you get the lantern?" answered, "The cook lights and cleans it and passes it to me and I hang it up." This is all.

Article 11 of the harbor rules (Act Aug. 19, 1890, c. 802, 30 Stat. 96 [U. S. Comp. St. 1901, p. 2879) provides that "a vessel under one hundred and fifty feet in length when at anchor shall carry forward, where it can best be seen, but at a height not exceeding twenty feet above the hull, a white light, in a lantern so constructed as to show a clear, uniform and unbroken light visible all around the horizon at a distance of at least a mile." The libel alleges that the Gurney was lying at anchor at about 10:40 p. m. "with an anchor light in the starboard rigging brightly burning." Not only has she failed to prove this allegation but, on the contrary, the only direct testimony on the subject is to the effect that the light was out. For these reasons we conclude that the Gurney was at fault and that the fault was the approximate cause of the collision. The Erastus Corning (D. C.) 25 Fed. 572; The Maggie Ellen (D. C.) 115 Fed. 442, affirmed by this court January 15, 1903, 120 Fed. 662.

Having thus found sufficient cause for the collision it is not necessary to pursue the discussion further. The Gurney's negligence having been clearly proved it is necessary for her to establish the Starin's fault by proof of equal cogency. The City of New York, 147 U. S. 72, 85, 13 Sup. Ct. 211, 37 L. Ed. 84. The faults attributed to the Starin are that she did not keep on the right-hand side of the channel; that she did not have an efficient lookout and that her speed was excessive. She was proceeding at the rate of about 12 knots an hour, headed for Long Island Sound, on a straight course, where, ordinarily, few vessels were to be encountered. We do not find sufficient evidence to warrant the conclusion that such speed was excessive, but it is enough to say that the speed in no way contributed to the accident. Had she been going at 6 or 7 knots an hour the collision would have occurred, but it might have been postponed a few minutes. We incline to the opinion that the Starin was actually a little to the right of the center of the channel, but, whether this be so or not, she was pursuing the usual course taken by all the New York steamers and this was known to navigators familiar with New Haven Harbor. There being no pretense that this is a case of meeting vessels, we do not think negligence can be predicated of the fact that the Starin was navigating in the center of the channel. The charge that she had an inefficient lookout has already been answered.

The decree is reversed with costs and the cause is remanded to the District Court with instructions to dismiss the libel with costs.