## UNITED STATES v. THE REPUBLIC NO. 2 et al.

### Civ. A. No. 367.

District Court, S. D. Texas, Galveston Division.

Jan. 5, 1946.

Brian S. Odem, U. S. Atty., and J. K. Smith, Asst. U. S. Atty., both of Houston, Tex., for plaintiff.

Royston & Rayzor and M. L. Cook, all of Houston, Tex., for claimant.

KENNERLY, District Judge.

The Intracoastal Waterway (Canal) crosses the Brazos River in this District and Division, and to protect the Waterway, the Government erected flood gates across the Waterway on each side of the River. It also erected, independently of the flood gates, "guide walls" designed and used to aid and guide vessels in passing into and through the flood gates. This suit, in rem, against the Tug Republic No. 2, the Barge ROR 104, the Barge ROR 105, and the Barge ROR 106 was brought here, originally in Admiralty, to recover damages and penalties by reason of alleged injury done by the Tug and Barges to such guide walls or part thereof on or about January 17, 1944, and February 28, 1944. The Tug and Barges were seized, and the Republic Oil Refining Company (for brevity called Claimant) has appeared, claimed same, and filed Stipulation in the sum of $12,000 in lieu thereof.

Claimant contended that the suit was not properly brought in Admiralty, and its contentions were sustained. It is a suit "by way of libel" under Section 412, 33 U.S.C.A., but not one in Admiralty.[1] Thereupon, by agreement, the case was trans-

---

[1] The Memorandum filed discussing the point is as follows:

"This is a libel by the Government under Sections 408 and 412, of Title 33, U.S.C.A., against the Tug Republic No. 2' and three barges, to recover penalties and damages for an alleged injury to one of the 'guide walls' built and maintained by the Government in connection with the Government's system of 'Flood Gates' at the crossing of the Intracoastal Waterway (canal) and the Brazos River, in this District and Division. The Republic Oil Refining Company, claimant of such Tug and Barges, has appeared and moved to dismiss the libel, because the matter is not cognizable in admiralty.

"The evidence with respect to the character, purpose, and use of the guide walls has been heard orally, and the facts are these:

"The Government has erected and maintains at the crossing of such waterway and such river, flood gates across the waterway on each side of the river, to prevent water and silt from the river entering the waterway and polluting and filling it, thus interfering with its navigation. Also to prevent other waters connected with the waterway and used by private individuals from becoming polluted or contaminated. The flood gates are supported by bases constructed on land on each side of the waterway, and extend across the waterway. They are operated something like a drawbridge—being opened to allow vessels to navigate the waterway.

"The 'guide walls' are part of the flood gate system, but are not physically a part of the flood gates. They are constructed independently of the flood gates, and are designed and used solely to aid navigation, i. e., to aid and guide vessels in passing through the flood gates. They are built partly in the water and partly on land.

"The authorities are numerous. The Panoil, 266 U.S. 433, 45 S.Ct. 164, 69 L. Ed. 366, 1925 A.M.C. 181. United States v. Evans (The Blackheath), 195 U.S. 361, 25 S.Ct. 46, 49 L.Ed. 236. Cleveland Terminal & Valley R. Co. v. Cleveland Steamship Co., 208 U.S. 316, 28 S.Ct. 414, 52 L.Ed. 508, 13 Ann.Cas. 1215. The Scow 6-S, 250 U.S. 269, 39 S.Ct. 452, 63 L.Ed. 977. The Gansfjord, 2 Cir., 32 F.2d 236, 1929 A.M.C. 731. The Gansfjord, D.C., 17 F.2d 613. The Gansfjord, D.C., 25 F. 2d 736. United States v. Mt. Parnes, 1942 A.M.C. 223. The Dixie, 30 F.Supp. 215, 1940 A.M.C. 70. The Dixie, D.C., 39 F.Supp. 395. The Barbara Cates, D.C., 17 F.Supp. 241, 1936 A.M.C. 1446.

"The leading cases are United States v. Evans (The Blackheath), supra; Cleveland Terminal v. Cleveland Steamship Co., supra; and The Panoil, supra. I think that the facts here bring the case within the scope of The Panoil, and that the case is not within the admiralty jurisdiction of this Court, and that Claimant's Motion should be granted.

ferred to the law side and has since proceeded as a Civil Action.

Some of the facts were stipulated In addition, the depositions of many witnesses were taken and offered. The Stipulation is as follows:

(a) "By agreement of counsel for plaintiff and claimant, the following facts are agreed to be true for the purpose of this action and as limited solely to the issue of claimant's liability for civil damages; claimant makes no admission in so far as the Government's two claims for penalties are concerned and nothing contained herein shall be construed or used as an admission of fact or otherwise in so far as said claims for penalties are concerned, but as limited to the issue of civil liability, the said facts are to be taken as true in all respects as if testified to by competent witnesses in open court:

"Libellant, United States of America, is a corporation sovereign and body politic. The tug Republic No. 2 (formerly the F. J. Gough), the barge ROR 104, the barge ROR 105 and the barge ROR 106 were properly served, claim instituted and stipulation to abide decree posted, and that this Honorable Court has jurisdiction of the subject matter by virtue of and through the provisions of Section 412 of Title 33, United States Code Annotated.

"On January 17, A.D. 1944, at approximately 2:30 p.m., the tug Republic No. 2 (formerly the F. J. Gough), and a tow consisting of barges ROR 106, ROR 105 and ROR 104, being towed in the order named, proceeded through the West gate of the Brazos River Flood Gates near Freeport, Texas, in Brazoria County, Galveston Division, Southern District of Texas, and started across the River. The weather was clear and there was a slight South wind. The river current was swifter than moderate and more than the master of the tug had expected. Upon the entrance of the tug and barges ROR 106 and ROR 105 into the River, the towing hawser and one coupling between barges ROR 105 and ROR 104 broke. The tug Sallie A. Rothermel, which was assisting in the crossing, held the tow until the tug Republic No. 2 could attach another tow line. A single line was placed between the tug Republic No. 2 to the amidships bit of the bow of the barge ROR 106, the first in order of procession of the three barges. The Sallie A. Rothermel was tied to the starboard side of the barge ROR 106 holding the tow, and during the process of securing the line to the barge ROR 106, the current carried both tug and the barges in tow approximately one hundred (100) yards below the entrance into the Intracoastal Canal and near the East bank of the River. After the line had been secured between the tug Republic No. 2 and the barge ROR 106, the tug Sallie A. Rothermel dropped back to the stern of the tow to assist the tow into the canal.

"The tug Republic No. 2 proceeded upstream with its tow until the tug was almost to the North bank of the Canal on the East side of the River at which time the tug Republic No. 2 commenced pulling its tow into the Canal. The current in the River kept the stern of the tow downstream and the tug Republic No. 2 was unable to break the tow away from the North guide walls. The tug was pulling at full speed at about a right angle to the lead barge. Just prior to the time that the barges struck the guide wall, the towing hawser between the barge ROR 106 and the tug Republic No. 2 broke. When it became apparent that the barges were going to hit the guide walls, the Sallie A. Rothermel at the stern of the tow went into reverse and stopped the tow after several piles were broken. Because of the way the current was running, it was impossible to put the tug alongside the barges and stop the tow from hitting the fender systems. At the time that the barges hit the guide wall they were at a slight angle about fifteen (15) points of the compass with the straight section of the guide walls.

"On February 28, A.D. 1944, at approximately 7:30 p.m., the tug Republic No. 2 (formerly the F. J. Gough), towing barges ROR 106, ROR 104 and ROR 105, in the order named, proceeded through the west gate of the Brazos River Flood Gates and maneuvered for position to proceed through the East gates. The tug Republic No. 2, followed by its tow, headed upstream after going through the West gate and then permitted the tow to drop downstream to get

"At the hearing on Claimant's Motion, it was stipulated between the Proctors that should it be held that the case is not within the admiralty jurisdiction of the Court, it may be transferred to the Civil Action side and proceed as a civil action. It will be so transferred. I take it that some amendment to the pleadings may be necessary."

into position to enter the canal. The tug Republic No. 2 proceeded into the Intracoastal Canal with a man on the barge to let out coupling lines on the port side so that the barges would break into a line with the gate. The man on the barges, one Johnny Huges, slacked off the port coupling line between the barges ROR 105 and ROR 104, whereupon, the barge ROR 106 pulled into line all right. Johnny Huges, the man on the barges, was unable to get the towing line back on the bit and the barge ROR 104 being the second one in the order of procession, continued on its course, ramming into the pilings of the North guide wall at the approach to the East gate from the river side, breaking several piles."

█ (b) The Depositions show that the guide walls were injured on January 17, 1944, and February 28, 1944, as set forth in the Stipulation. I think that neither the Stipulation nor the Depositions show that the injury done to such guide walls on January 17, 1944, and on February 28, 1944, was caused by the negligence of those owning, operating, or in charge of such Tug

and Barges, as charged in Plaintiff's Amended Pleadings, and I find that there was no negligence. Taking into consideration the facts stipulated and those shown by the Depositions, I think the accidents complained of could not reasonably have been avoided.

(c) The views of the counsel and the witnesses respecting the actual damages caused by the injury on January 17, 1944, and the one on February 28, 1944, take a wide range, but considering the Stipulation and all the evidence, and using "judgment and estimate,"[2] I find the actual damages caused the guide walls by the injury of January 17, 1944, to be $2,500, and the actual damages caused the guide walls by the injury of February 28, 1944, to be $3,000.

█ 1. There being no negligence on the part of the owners, operators, and those in charge of the Tug and Barges, I take it the Government cannot recover at common law. However, the suit is brought by the Government under the Act of Congress of March 3, 1899, 30 Stat. 1152, 1153, a part of which is now Sections 408,[3] 411,[4] and 412,[5] 33 U.S.C.A., the Government claim-

---

[2] In American Weekly v. Houston Printing Corporation, 134 F.2d 450, in speaking of finding damages, it is said: "As in all problems of damages, where no exact measure is provided, there is room for judgment and estimate by the fact finder."

[3] Section 408 is as follows (emphasis mine):

"It shall not be lawful for any person or persons to take possession of or make use of for any purpose, or build upon, alter, deface, destroy, move, injure, obstruct by fastening vessels thereto or otherwise, or in any manner whatever impair the usefulness of any sea wall, bulkhead, jetty, dike, levee, wharf, pier, or other work built by the United States, or any piece of plant, floating or otherwise, used in the construction of such work under the control of the United States, in whole or in part, for the preservation and improvement of any of its navigable waters or to prevent floods, or as boundary marks, tide gauges, surveying stations, buoys, or other established marks, nor remove for ballast or other purposes any stone or other material composing such works: Provided, That the Secretary of War may, on the recommendation of the Chief of Engineers, grant permission for the temporary occupation or use of any of the aforementioned public works when in his judgment such occupation or use will not be injurious to the public interest."

[4] Section 411 is as follows:

"Every person and every corporation that shall violate, or that shall knowingly aid, abet, authorize, or instigate a violation of the provisions of sections 407, 408, and 409 of this chapter shall be guilty of a misdemeanor, and on conviction thereof shall be punished by a fine not exceeding $2,500 nor less than $500, or by imprisonment (in the case of a natural person) for not less than thirty days nor more than one year, or by both such fine and imprisonment, in the discretion of the court, one-half of said fine to be paid to the person or persons giving information which shall lead to conviction."

[5] Section 412 is as follows (emphasis mine):

"Any and every master, pilot, and engineer, or person or persons acting in such capacity, respectively, on board of any boat or vessel who shall knowingly engage in towing any scow, boat, or vessel loaded with any material specified in section 407 of this title to any point or place of deposit or discharge in any harbor or navigable water, elsewhere than within the limits defined and permitted by the Secretary of War, or who shall willfully injure or destroy any work of the United States contemplated in section 408 of this title, or who shall willfully obstruct the channel of any waterway in the manner contemplated in section 409 of this title, shall be deemed guilty of a violation of sections 401, 403, 404, 406–409, 411–416, 418.

ing the right to recover both the damages and penalties under Section 412.

Clearly, the injury to the guide walls comes within the scope of and is unlawful under Section 408. Section 411 makes natural persons and corporations who are guilty of violating Section 408 punishable by a fine of not less than $500 nor more than $2,500, and/or natural persons punishable in addition by imprisonment of not less than 30 days nor more than one year. The first paragraph of Section 412 provides for the revocation or suspension of the license of any master, pilot, engineer, etc., convicted under Section 408, and the second paragraph of Section 412 provides that the Government may recover from any boat, vessel, etc., used or employed in violating Section 408, the pecuniary penalties fixed in Section 411 and "in addition thereto" the amount of damages done by such boat, vessel, etc. Based on the wording of Sections 408, 411, and 412, I think the Government is right, and that it may recover here both the above-stated damages and a penalty, which is fixed at $500 for each injury, making a total recovery of $6,500.

This view is upheld in New England Dredging Co. v. United States, 1 Cir., 144 F. 932, 933. The Statute under construction there was the Act of March 3, 1899, and Sections 13 and 16 thereof, which are now Sections 407 and 411 of 33 U.S.C.A. The proceeding was in rem under Section 13 (now Section 407) against a boat or vessel for unlawfully discharging refuse matter into the navigable waters of the United States. The District Court permitted the recovery of a penalty under Section 16 (now Section 411), and the Circuit Court of Appeals, in affirming the decision, uses this language, which I think is the rule applicable to the case here:

"The scow in question belonged to the New England Dredging Company, and was loaded with dredged material which was discharged by the voluntary act of the scowmen in charge into waters of the United States covered by the statute to which we have referred. The act of the scowmen was without orders from the owner, the person in charge of the dredge, or the captain of the tugboat, and contrary to general instructions not to discharge without orders, and there was no evidence as to his motive for the act.

"The contention of the United States upon the question of the liability of the vessel was sustained in the District Court by Judge Lowell with some doubt, and the case is here on appeal.

"If the view of the United States is upheld, it is by virtue of the modern body of law, existing in this country, as well as in England, which is founded upon the arbitrary but necessary police power inherent in government, rather than upon general principles which govern in other cases.

"This exceptional rule, founded largely upon statutes enacted for the enforcement of the plenary power in government, is recognized as applying to violations of the revenue laws, situations involving municipal exigencies (California Reduction Co. v. Sanitary Reduction Works [199 U.S. 306], 26 S.Ct. 100, 50 L.Ed. 204; Gardner v. People of State of Michigan [199 U.S. 325], 26 S.Ct. 106, 50 L.Ed. 212), and a variety of conditions relating to the public health and the public good.

"As to wrongs within this rule, the penalty is supposed to attach to the offending act without regard to the question of willfulness or intent, and without regard to the question of mistake or innocence. The rule is, of course, in derogation of the principles of the common law, and its drastic quality is justified upon grounds of necessity, and as in the interest of the public good.

"The expressed object of resorting to the exercise of plenary power through arbitrary and exceptional remedies in such matters, is to better safeguard the public good in situations where the public good is easily subject to imposition and injury

502, 549, 686, 687 of this title, and shall upon conviction be punished as provided in section 411 of this title, and shall also have his license revoked or suspended for a term to be fixed by the judge before whom tried and convicted. *And any boat, vessel, scow, raft, or other craft used or employed in violating any of the provisions of sections 407, 408, and 409 of this title shall be liable for the pecuniary penalties specified in section 411 of this title, and*

*in addition thereto for the amount of the damages done by said boat, vessel, scow, raft, or other craft,* which latter sum shall be placed to the credit of the appropriation for the improvement of the harbor or waterway in which the damage occurred, and said boat, vessel, scow, raft, or other craft may be proceeded against summarily by way of libel in any district court of the United States having jurisdiction thereof."

through heedless, inadvertent, or indifferent violations of laws enacted for the general welfare, and such remedies are enforced even in respect to certain of the lower statutory crimes and misdemeanors as well as in a limited class of cases involving civil conditions."

The Gansfjord, D.C., 25 F.2d 736, 738, arose under these three Sections (Sections 408, 411 and 412), but its force as authority on the point we have here is weakened, because the District Judge found the master of the vessel and the bar pilot guilty of gross negligence, yet in closing the discussion, the District Judge says: "My conclusion, therefore, is that, even though there was not a fair preponderance of evidence to sustain the seemingly superfluous allegation of negligence in the libel, and even though I am in error in my finding of negligence and want of skill, the cause of action and the remedy sought is precisely within the terms of the statute."

This view is also to some extent upheld in The Scow No. 9, D.C., 152 F. 548, and I find nothing in the majority opinion in Hegglund v. United States, 100 F.2d 68, Fifth Circuit, to the contrary, though the minority opinion is probably to the contrary. The Hegglund case was under the Act of 1924, Section 433, 33 U.S.C.A., and not under the Act of 1899, and the case was a criminal prosecution against Bidwell, the Master of the boat or vessel, charged with discharging oil into navigable waters.

From what has been said, it follows that judgment should be rendered in favor of the United States for $6,500, and a decree may be prepared and presented accordingly.