**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**TUG COLETTE MALLOY et al.,**
**Defendants-Appellants.**

No. 74–1144.

United States Court of Appeals,
Fifth Circuit.

Feb. 12, 1975.

Rehearing Denied March 18, 1975.

J. Martin Green, Beaumont, Tex., William D. Deakins, Jr., Houston, Tex., for defendants-appellants.

Anthony J. P. Farris, U. S. Atty., Charles B. Wolfe, Jack Shepherd, Robert Darden, Asst. U. S. Attys., Houston, Tex., Morton Hollander, Chief, Appellate Sec., Civ. Div., Robert E. Kopp, James C. Hair, Jr., Harry R. Silver, Attys., Dept. of Justice, Washington, D. C., for plaintiff-appellee.

Before TUTTLE, RONEY and GEE, Circuit Judges.

GEE, Circuit Judge:

On the foggy morning of March 16, 1968, the loaded tank barge LSC 100–C, in the tow of the Tug COLETTE MALLOY, struck and damaged the north sector gate of the West Brazos River Floodgates. The United States, as owner of the Brazos River Floodgates, brought suit in admiralty against the Tug COLETTE MALLOY and the Barge LSC 100–C, *in rem*, and their owner, Levingston Shipbuilding Company, *in personam*. The United States also sought penalties against both vessels for violation of 33 U.S.C. §§ 408, 411 and 412, and against the tug for violation of 33 U.S.C. §§ 159, 191. The trial court found Levingston Shipbuilding Company free from liability but found the tug and the barge liable in rem for damages to the gate and for the statutory penalties. The defendants appeal, contending that since the trial court found the United States, through its gate operator, the sole party at fault the vessels could not be found fully liable. Further, defendants contend that the trial court erred in not requiring the United States to indemnify the vessels. The United States replies that the trial court reached the correct result, albeit

for incorrect reasons, and that the vessels were not entitled to indemnity under the Suits in Admiralty Act, 46 U.S.C. § 741 et seq. We agree with the United States and so affirm.

Most of the facts are undisputed. The Brazos River Floodgates are located at the confluence of the Intracoastal Canal and the Brazos River. They are on the navigable waters of the United States, and their primary purpose is to prevent silt, sand, alluvium and other debris coming down the Brazos River from entering the Intracoastal Canal. One floodgate is located at each bank of the Brazos River. Steel wingwalls guide vessels' entrance to the gates. Located on top of each wingwall are lights spaced at intervals of thirty feet. At the west gate there is a twenty-foot high light standard used to indicate whether the gate is open or closed.

About thirty minutes before the collision, John J. Flippen, mate of the Tug COLETTE MALLOY, contacted the east gateman, Leo Pruitt, by radio to advise him that the COLETTE MALLOY was approaching the east floodgate. After being cleared, the flotilla advanced across the river in a dense fog toward the west floodgate. The trial court found that despite the fog the Tug COLETTE MALLOY did not sound her fog signals while crossing the river. Once across the river, the flotilla lined up with the wingwalls and approached the gates at a speed under two miles per hour. The tankerman, Ralph Mathews, had been stationed on the bow of the barge to aid in fending off the wingwalls and to serve as a lookout. Owing to the fog, it was just before the collision when Mathews first saw that the floodgates were closed. His sole means of signalling the wheelhouse were by flashlight or by shouting. Finding his flashlight useless in the fog, Mathews shouted that the gates were closed. The trial court found that the shout went unheard in the wheelhouse and that this constituted fault on the part of defendants in failing to provide suitable means of communication between lookout and wheelhouse.

The trial court further found that the west gateman had erred in not opening the gates in time to allow the flotilla passage, since he was aware that the tug and barge were proceeding across the Brazos. The captain was unable to stop and reverse the flotilla after realizing the gates were shut, and the flotilla crashed into them causing damage. Asked for an additional finding of fact, the trial court found that the Tug COLETTE MALLOY failed to give sound signals prior to entry into the floodgates in violation of 33 C.F.R. 207.180d(2).

▇ 33 U.S.C. § 408 provides:

§ 408. Taking possession of, use of, or injury to harbor or river improvements

It shall not be lawful for any person or persons to take possession of or make use of for any purpose, or build upon, alter, deface, destroy, move, injure, obstruct by fastening vessels thereto or otherwise, or in any manner whatever impair the usefulness of any sea wall, bulkhead, jetty, dike, levee, wharf, pier, or other work built by the United States, . . . in whole or in part, for the preservation and improvement of any of its navigable waters or to prevent floods. . . .

The Brazos River floodgates are "works" within the meaning of the Act. United States v. The Republic No. 2, 64 F.Supp. 373 (S.D.Tex.1946). 33 U.S.C. § 412 imposes penalties for violation:

And any boat, vessel, scow, raft, or other craft used or employed in violating any of the provisions of sections 407, 408, and 409 of this title shall be liable for the pecuniary penalties specified in section 411 of this title, and in addition thereto for the amount of the damages done by said boat, vessel, scow, raft, or other craft, which latter sum shall be placed to the credit of the appropriation for the improvement of the harbor or waterway in which the damage occurred, and said boat, vessel, scow, raft, or other craft may be proceeded against summarily by way of libel in any district court of the United States having jurisdiction thereof.

Together these statutes have been construed to impose strict liability. United States v. The M/V Martin, 313 F.2d 851 (7th Cir. 1963); United States v. The Tug Terry E. Buchanan et al., 138 F.Supp. 754 (S.D.N.Y.1956); United States v. The Republic No. 2, supra; The Gansfjord, 25 F.2d 736, 738 (E.D.La. 1928), aff'd, Aktieselskabet Dampskib Gansfjord v. United States, 32 F.2d 236 (5th Cir.), cert. denied, 280 U.S. 578, 50 S.Ct. 32, 74 L.Ed. 629 (1929).

■■■ It is admitted that the barge struck and damaged the floodgates. The controversy stems from the trial court's findings of fact that neither the failure to give fog or sound signals nor the lack of effective communication between lookout and wheelhouse contributed to the collision and that the sole cause of the accident was the west gateman's failure to open the floodgates earlier. Defenses to the strict liability imposed by these statutes are not well-developed; however, we have no doubt that if the tug had shown the gateman to be solely at fault in causing the accident a defense would have been established. Rebel Towing Co. & Texmar, Inc. v. United States, Consolidated Admiralty No. 64–H–67 (S.D.Tex., March 3, 1965). Here the evidence of the tug's own causal contributions to the accident negates the possibility of a sole cause defense. That concluded, whether the United States was in no way negligent or contributorily negligent is immaterial. Garden-vari-ety contributory negligence is not ordinarily deemed a defense to strict liability,[1] and we do not believe that such fault should be a defense in this strict-liability admiralty suit.

It is undisputed that the tug violated several statutory and regulatory measures. 33 C.F.R. 207.180(d)(2) provided at the time of the occurrence:

*Sound signals.* Vessels desiring passage through a lock or floodgate in either direction shall give notice to the lockmaster or gatetender by three long and distinct blasts of a horn or whistle or calls through a megaphone when within a reasonable distance from the lock or floodgate. When the lock or floodgate is ready for entrance, the lockmaster or gatetender shall reply with three long blasts of a horn or whistle or calls through a megaphone. When the lock or floodgate is not ready for entrance, the lockmaster or gatetender shall reply by four or more short, distinct blasts of a horn or whistle or calls through a megaphone (danger signal). Permission to leave the lock or floodgate shall be indicated by the lockmaster or gatetender by one long blast.

The trial court's finding that the Tug COLETTE MALLOY did not give sound signals as required by the regulation is supported by the evidence.[2]

■■■ The district court also found, and his finding is supported by the evidence,[3] that the lookout posted on the

---

1. Prosser, Law of Torts, § 78 (3d ed. 1964). The author points out that one type of action, sometimes labelled contributory negligence, constitutes a defense: voluntarily and unreasonably encountering a known danger. There is no evidence of that here, and we do not speak of contributory negligence in that sense.

2. Roy Miles King, west gate operator, testified on direct examination that he was in a position to hear signals but heard none. Ralph Edward Mathews, the tankerman for the Tug COLETTE MALLOY testified on direct that he recalled no whistle signals. Thomas Tatum, Captain of the COLETTE MALLOY at the time of the collision, admitted in his deposition that he made no whistle signals. The only evidence to the contrary is an uncertain statement from the tug's mate, John J. Flippen. In any case, the other testimony amply supports the finding that no whistle or comparable sound signals were given.

3. The lookout testified that after he realized those in the wheelhouse could not see his flashlight he shouted 'that the gates were closed. He stated that he thought he felt the engine go into neutral at that time. On further questioning, he admitted:

    Q. Now after you first yelled, did you yell again? Did you have to yell again to the man on the bridge?

    A. Yes, I yelled the second time. After I waited and didn't hear the engines speed up again, after they went into neutral I thought he was going to re-

bow of the barge was not provided adequate means of communication with the wheelhouse. If the lookout cannot, or does not, report his observations, improper watch is being maintained, Coyle Lines, Inc. v. United States, 195 F.2d 737 (5th Cir. 1952); Sun Oil Co. v. S. S. Georgel, 245 F.Supp. 537, 545 (S.D.N.Y. 1965), aff'd, 369 F.2d 406 (2d Cir. 1966); and 33 U.S.C. § 221[4] is violated. Finally, the district court found that the Tug COLETTE MALLOY did not sound her fog signals while proceeding from the East Brazos River Floodgates to the west floodgates despite the dense fog on the river. The evidence supporting this finding is uncontroverted. Failure to sound signals violated the clear statutory directive of 33 U.S.C. § 191,[5] a statute designed to prevent collisions. 33 U.S.C. § 154. The court below found as facts, that none of the violations contributed to the collision and that the sole cause of the accident was the gateman's own inattentiveness or error of judgment. We cannot agree, and deem such findings clearly erroneous. Rule 52(a), Federal Rules of Civil Procedure. It is true that the west gateman heard by radio that the east gateman had allowed the tug and barge to pass through the east gates and enter the river. This was some notice of the approach of the vessels. It is also true, however, that had the Tug COLETTE MALLOY complied with the duty imposed by 33 C.F.R. 207.180(d)(2) by giving the requisite sound signals and waiting for the answering signals of the gateman no collision would have occurred. This omission contributed to the accident. Similarly, fog signals sounded during the river crossing would have alerted the gateman that the tug was near. The gateman, aided by these signals, could have accurately judged just when the gates should have been opened, keeping river debris out of the canal in the interim. Finally, if the tug's captain had been apprised that the gates were closed immediately as that fact became known to the lookout, the accident might have been averted. In short, the result below was the correct one—the vessels are indeed liable under the statutes—but for the reason that as a matter of fact and law the United States was not solely at fault in causing the accident.

■ Failing to escape liability, defendants contend that the United States should be required to indemnify them pursuant to the Suits in Admiralty Act, 46 U.S.C. § 741 et seq., and the Federal Tort Claims Act, 28 U.S.C. § 1346(b). Indemnification would undermine the strict liability imposed by the statutes; we refuse to grant it here.

Affirmed.

---

verse the engines and I didn't hear it speed up again and I yelled again.

Q. So apparently he had not heard you, then?

A. I'm afraid not.

Tr. 83-84.

Flippen, the mate in the wheelhouse, testified in deposition that he could not hear the lookout shout from the bow.

4. "Nothing in these rules shall exonerate any vessel, or the owner or master or crew thereof, from the consequences of any neglect to carry lights or signals, or of any neglect to keep a proper lookout, or of the neglect of any precaution which may be required by the ordinary practice of seamen, or by the special circumstances of the case."

33 U.S.C. § 221.

5. "In fog, mist, falling snow, or heavy rainstorms, whether by day or night, the signals described in this section shall be used as follows, namely:

(e) A steam vessel when towing, shall . . . at intervals of not more than one minute, sound three blasts in succession, namely, one prolonged blast followed by two short blasts."